IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

UNITED STATES OF AMERICA

vs.                                                          CASE NO. 1:08cr32-SPM

JULIO RODRIGUEZ,
LEONEL ROMAN,
YULIO RODRIGUEZ, and
DANIA LEZCANO-SANTANA,

    Defendants.
_____/

## ORDER GRANTING MOTION TO SUPPRESS

THIS CAUSE comes before the Court upon separate Motions to Suppress filed by Defendant Julio Rodriguez ("J. Rodriguez") (doc. 142), Defendant Leonel Roman (doc. 143), and Defendant Yulio Rodriguez ("Y. Rodriguez") (doc. 144). Additionally, Defendant Roman filed a motion to adopt the motions to suppress filed by Defendants J. Rodriguez and Y. Rodriguez. (doc. 146) Defendant Dania Lezcano-Santana also filed a motion to adopt J. Rodriguez's motion to suppress. (doc. 159) The Government filed a response. (doc. 155) A hearing on all suppression and standing issues was held on February 12, 2009.

J. Rodriguez contends that evidence and statements obtained during the search of a house at 6550 SE 123rd Terrace in Levy County, Florida should be suppressed because agents from the Drug Enforcement Agency and the Levy

County Drug Task Force unlawfully entered the curtilage of J. Rodriguez's home without a warrant, thereby tainting the subsequent search warrant. Additionally, Defendants Roman and Y. Rodriguez argue that they have standing to bring this Fourth Amendment challenge because they were invited overnight guests to J. Rodriguez's house and as a result, they had a reasonable expectation of privacy in that home.

I.  **BACKGROUND**

Testimony at the hearing established that on August 10, 2008, officers from the Levy County Drug Task Force were contacted by officers in Marion County. Marion County officers had been investigating a marijuana grow operation in Marion County. During the course of that investigation, they placed a tracking device on a vehicle. This vehicle then traveled to the home in Levy County that is the subject of this suppression motion. From August 12, 2008 through August 26, 2008, Levy County officers conducted surveillance on the home.

On August 26, 2008, the Marion County officers told the Levy County officers that they had obtained a search warrant and were about to execute the warrant on the Marion County property. This information spurred the Levy County officers into action. On that day, during their surveillance of the property, the officers saw two vehicles depart from the Levy County property. One vehicle was a silver Ford pickup and the other was a silver Toyota pickup. The officers observed the trucks sitting at the property for at least forty minutes

prior to their departure. The officers did not see anyone get into the trucks. They only saw the trucks drive away. As they drove away, both vehicles were stopped by different Levy County officers. Officers Duane Dykstra and Rick Rogers stopped the Ford truck. Captain Anderson stopped the Toyota truck.

When he approached the Toyota truck, Anderson noticed a strong odor of marijuana emanating from the truck and from a pile of clothes that were sitting in the back seat of the truck. Anderson tried to speak to the driver, but Anderson did not speak Spanish and the driver did not speak English. Anderson secured the driver. Eventually, Officer Garcia,[1] a Spanish-speaking officer, arrived on the scene to provide translation services. Through Officer Garcia, the driver communicated that he was driving around the area looking for property to purchase. He denied any knowledge of the property at 6550 SE 123rd Terrace.

Officer Dykstra stopped the Ford truck for rolling through a stop sign. The driver was identified as Yulio Rodriguez. When the officer asked the driver what he was doing in the area, the driver stated that he was driving up from Miami and was lost. He said that he was looking for Interstate 75. He also denied any knowledge of the property at 6550 SE 123rd Terrace. Y. Rodriguez was then placed under arrest. While the officers were conducting surveillance on the house, they had no information about the house other than its connection

---

[1] Officer Scott Garcia was later terminated from the sheriff's office. No reason for his termination was offered at the hearing.

to a car seen leaving a marijuana grow operation in Marion County. Anderson testified that this information was sufficient to justify surveillance. Later, when the officers stopped the truck drivers for moving violations, the drivers' dishonest answers to the questions raised further suspicion.

After securing the two drivers, the police returned to the house. At the house, there were several Levy County officers and at least one Drug Enforcement Agency agent. Upon approaching the house, the DEA agent saw a five-foot high cattle gate covered with wire fencing. This gate was connected to a five-foot high wire fence that appeared to encircle the entire property. On the gate was a sign that said "Beware of Dogs." Photos produced at the hearing show an additional sign posted on the fence that said "No Trespassing." None of the officers remembered seeing the "No Trespassing" sign on August 26.

There were five to six officers at the property. While standing at the gate, there was no way for the officers to conclude that the house contained a marijuana grow operation. The officers testified that they could see the house from the street. However, the pictures offered into evidence that were taken from the street do not show the house through the heavily wooded-area that is in front of the house. The house sits on a large piece of property that appears to consist of several acres.

The gate attached to the fence that enclosed the property had an electronic mule gate opener. The gate was not locked, but the gate operator was in a closed position with a pin holding the gate secure. The officers testified

that one of the DEA agents removed the pin that connected the operator to the gate and pushed the gate open.  Nothing on the gate or the gate opener was damaged but a part of the gate opener was dismantled.

A car was parked at the house, indicating that people may have been inside.  The officers testified that this car could be seen from the street outside the gate.  The officers testified that the location where they stopped the trucks was visible from the house.  As a result, the officers were concerned that the people inside the house could have been notified about the arrest of the two men in the trucks. Anderson testified that this was the reason that he entered the property to make contact with the occupants.  Even though Anderson could not hear what was going on inside of the house, he was concerned that the occupants could have been destroying evidence.  He was also concerned that occupants may be attempting to escape from the house or arm themselves.

Upon approaching the house, the officers saw goats, chickens and dogs on the property.  As the officers got closer to the house to engage the occupants, they saw two people inside.  While approximately ten feet from the house, the officers noticed the smell of marijuana emanating from the house.  Anderson knocked loudly and identified himself as a police officer.  A person came near the door, looked out, turned around and shouted something to someone in Spanish, and then ran away from the door.  Anderson kicked the door open and walked into the house to see what was going on and to ensure that the occupants were not arming themselves or destroying evidence.  He was the first one to enter the

house.  Officer Dykstra was second.  Anderson found two individuals inside of the house.  One was identified as J. Rodriguez and the other person was identified as Leonel Roman.  The officers removed both men from the house.  Anderson conducted a protective sweep of the house to see if anyone else was inside.  While doing so, he spotted the marijuana grow operation.

The officers discovered that J. Rodriguez was the owner of the house.  J. Rodriguez and Roman waited on the front porch of the house during the protective sweep.  During that time, Officer Dykstra decided to secure a search warrant.  When Dykstra returned with the search warrant, the officers searched the interior of the home.  They found 110 freshly harvested marijuana plants, 111 plants growing in a another building on the property, and approximately 290 pounds of drying marijuana.  Dykstra saw at least one bedroom and a mattress in the living room.  Officers believed that people lived inside the residence.  Dykstra saw personal possessions belonging to Roman in the house.  Dykstra testified that the house was like a maze because interior walls had been erected.  Anderson testified that the house had three or four bedrooms, but the only furniture inside the house was one bed, a couch, a mattress, dining room furniture, and a washer and dryer.

None of the four people detained had identification listing the 6550 SE 123rd Terrace address.  Y. Rodriguez testified that the house belonged to his father, J. Rodriguez.  Y. Rodriguez had slept at that house for three days before his arrest.  Y. Rodriguez slept on the mattress in the living room and he brought

clothes and a toothbrush with him. He ate the food in the house and did his laundry at the house. He also testified that while he was there, other people visited the house.

Roman testified that he had been invited to the home by the owner, J. Rodriguez. Roman rode to the house with Y. Rodriguez to stay and do work for J. Rodriguez. Roman had stayed at the house three days before he was arrested. Roman slept in the bedroom. Roman had brought with him work shorts, underwear, regular shorts and a toothbrush. He planned on leaving J. Rodriguez's house after he completed some painting and other construction work that J. Rodriguez asked him to do. As of the date of his arrest, Roman had not yet started the work assignments. Dykstra testified that he did see personal information and possessions belonging to Roman in the house.

## II. ANALYSIS

### A. Standing

"Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted." Alderman v. United States, 394 U.S. 165, 174 (1969). With respect to a third party's premises, a person's standing to challenge a search will depend on whether the person has a reasonable expectation of privacy in the premises, and whether it is an expectation of privacy that society is prepared to recognize. Minnesota v. Olson, 495 U.S. 91, 97-98 (1990).

An overnight guest has a recognized expectation of privacy on a third

party's premises. Id. at 96-97. This expectation of privacy is sufficient to confer standing to challenge a search of the premises. Id. "From the overnight guest's perspective, he seeks shelter in another's home precisely because it provides him with privacy, a place where he and his possessions will not be disturbed by anyone but his host and those his host will allow inside." Id. at 99. These expectations are shared and valued by society, and therefore recognized under the Fourth Amendment. Id. at 98.

In contrast, a person located at a third person's premises solely for a business transaction does not have a reasonable expectation of privacy in the premises and has no standing to challenge a search. Minnesota v. Carter, 525 U.S. 83, 91 (1998). Factors such as the "commercial nature of the transaction, the relatively short period of time on the premises, and the lack of any previous connection between the [person] and the householder" all lead to a diminished connection to the premises and consequently, a diminished expectation of privacy. Id. at 91.

In this case, the Government contends that none of the Defendants have standing to challenge the search of the house because they all allowed other people to be present in the home during the grow operation. Additionally, at their initial appearance before the Magistrate Judge, all of the Defendants stated that they did not reside in that home.

According to testimony offered by the Defendants and the officers at the hearing, both Roman and Y. Rodriguez were overnight guests staying in the

house. From all indications, it appears that Roman had recently arrived from out of town for the main purpose of working on the property and Y. Rodriguez was visiting his father. Y. Rodriguez testified further that he used to live with his father in Miami. Both Defendants' personal belongings were found inside the house.

Furthermore, there was a previous social connection between J. Rodriguez and Roman and Y. Rodriguez. From all indication, Roman was not merely a worker expecting payment for services. He was a social guest who knew J. Rodriguez, the home owner. In addition to this social purpose, Roman testified that he was preparing to do work for J. Rodriguez. Therefore, because there was more than a purely commercial reason for their presence, there was a significant period of time spent on the premises, and both Defendants had a prior connection to the homeowner, they both had an expectation of privacy in J. Rodriguez's home. Accordingly, Roman and Y. Rodriguez, along with J. Rodriguez have standing to challenge the search.

However, Defendant Dania Lezcano-Santana put forth no evidence at the hearing that would support standing. She appears to have had no contact with the house or J. Rodriguez. Accordingly, she has no reasonable expectation of privacy in the premises or the items found therein.

### B.     Curtilage

The Fourth Amendment protects people from unreasonable searches and seizures. U.S. Const. amend. IV. "For a search to be unconstitutional, a defendant must establish both a subjective and an objective expectation of

privacy." United States v. Lowry, No. 08-11615, 2008 U.S. App. LEXIS 26298, at *2 (11th Cir. Dec. 24, 2008) (citing United States v. Segura-Baltazar, 448 F.3d 1281, 1286 (11th Cir. 2006)).  And this expectation of privacy must be one that society is prepared to recognize as reasonable.  United States v. Robinson, 62 F.3d 1325, 1328 (11th Cir. 1995).  The Fourth Amendment "gives the guarantee that a man's home is his castle beyond invasion either by inquisitive or by officious people."  Pub. Utils. Comm'n v. Pollak, 343 U.S. 451, 467 (1952).  The case at bar grapples with the question of how far outside of that castle does this expectation of privacy (and hence, application of the Fourth Amendment) reach.  The answer is determined by considering "whether an individual reasonably may expect that the area in question should be treated as the home itself."  United States v. Dunn, 480 U.S. 294, 300 (1987).  This area is referred to as curtilage.

Curtilage is the area around the home that "harbors those intimate activities associated with domestic life and the privacies of home."  Dunn, 480 U.S. at 300.  This is in contrast to "open fields," which are regarded for Fourth Amendment purposes as tantamount to public places.  Id.  Open fields include undeveloped or unoccupied areas outside of the curtilage, even if those areas are neither open nor fields as those terms are commonly understood.  Id.  Open fields typically occupy the area between the public street and the area immediately adjacent to the house.  Open fields are not entitled to Fourth Amendment protection. Oliver v. United States, 466 U.S. 170, 181-82 (1984).  However, at some point en route from the public area (outside the gate), through the open field, to the person's

front door, the area being traversed is no longer an open field and it becomes the curtilage of the house, which *is* entitled to Fourth Amendment protection.

Curtilage is not defined solely by the property line. Id. at 301. Nor is the existence of fencing alone determinative of where curtilage begins. Id.; see also Taylor, 458 F.3d 1201, 1208 (11th Cir. 2006) ("A perimeter fence around property does not create a constitutionally protected interest in all the open fields on the property."). Instead, curtilage is defined by reference to four factors that reflect upon whether an individual reasonably may expect the area to be treated as "an adjunct of the house." Id. at 302. The four factors are: (1) the proximity of the area to the house, (2) whether the area is within an enclosure surrounding the house, (3) nature of the uses to which the area is put, and (4) the steps taken to protect the area from observation by the public. Id. at 301. These factors "bear upon whether an individual reasonably may expect that the area in question should be treated as the home itself." Dunn, 480 U.S. at 300. Applying these four factors to the property at issue, although it is a close case, this Court finds that the officers unlawfully intruded upon Defendant's curtilage without a warrant.

First, the area where the officers initially smelled the marijuana was approximately ten feet from the front door. This is not a substantial distance. This area is very close to Defendant's house.[2] Consequently, it was close enough to

---

[2] The officers' proximity to the house distinguishes this case from United States v. Lima-Suarez, No. 1:05cr40-SPM, Order Denying Motion to Suppress, doc. 213, 2006 WL 763426 (N.D. Fla. Mar. 23, 2006). In Lima-Suarez, the officers jumped the fence surrounding an 80-acre parcel of property and walked up a paved driveway toward the house. They did not reach the house, however, and encountered an occupant approximately 50 yards away from the house. Id. at *5.

constitute the "immediate domestic establishment of the home." United States v. Berrong, 712 F.2d 1370, 1374 (11th Cir. 1983).

This Court does not dispute the fact that when the officers smelled marijuana ten feet from the door, the officers had probable cause to obtain a warrant to search the premises. What this Court does conclude, however, is that in arriving at the location where they smelled the marijuana, the officers had unlawfully entered Defendant's curtilage. Admittedly, the line at which the curtilage starts and is therefore differentiated from an open field is not a clear line. But at some point, between the locked gate that separates Defendant's property from the public street and the Defendant's front door, the officers passed into an area where Defendant had a privacy right that society is prepared to accept. That area is relatively close to the home. Accordingly, this first factor supports a finding that the point at which the officer was first alerted to the presence of contraband occurred within curtilage.

Second, the area where the officers first smelled the marijuana is included within an enclosure surrounding the home. The enclosure consisted of a fence with a locked electronic gate. From the point of view of a person standing at the gate, it appeared that the fence went around the entire perimeter of the property, closing in all areas. The presence of this fence demonstrates the occupant's subjective desire to establish a zone of privacy for his daily living activities. This factor also supports a finding that the officer's observation occurred within curtilage.

In contrast to the first two factors, application of the third factor supports the Government's conclusion that the area where the police smelled the marijuana was not within Defendant's curtilage.  There was no evidence that intimate activities of the home were taking place in this area.  However, because a person would have to jump over a five-foot fence or manipulate an electronic gate to arrive at the area in question, this is not an area that visitors would normally cross, including commercial business visitors.  Because the mailbox is located outside of the property, even a delivery person would not be expected in the location where the officers smelled the marijuana.

Finally, the testimony and pictures offered in evidence at the hearing demonstrated that the area where the officers smelled the marijuana was not a portion of land that was readily visible from the area just inside (or outside) the gate.  Officers testified that they could see the house from the property, but the pictures admitted during the hearing that were taken from the gate do not show that the house was actually visible to a passerby on the street.

This factor is important to the Court's determination that the area ten feet from the house was an area that the owner treated as the home itself and in which the homeowner had a reasonable expectation of privacy.  The natural vegetation and the distance of the house to the street made it virtually impossible to see the house from a vantage point available to the public.  The homeowner's decision to allow the vegetation to grow so thickly, the purchase of a house so far from the road, and the purchase of a fence and an electronic gate, all constitute steps

taken by the resident to protect the area from observation by people passing by.

Taking all of the factors into consideration, the Court finds that the area located ten feet from Defendant's house is an area immediately surrounding the home and constitutes part of the curtilage. In this case, the initial, olfactory observations made by the officer occurred near the front door of a house that was located within a fenced in area, behind a closed electronic gate, and obscured from the public street outside the gate. When the front door is protected in such a way, it is no longer a common area for access or a principal means of access to the house from the street. It does not have a diminished expectation of privacy. This is especially true if, as pictures represent, the house cannot be seen from the public area outside of the gate.

Because the area enclosed by the fence extends a substantial distance from the house, the Court does not find that the entire fenced-in area is curtilage. But at some point between the area in which the officers smelled the marijuana and the fence, the officers entered into Defendant's curtilage. The areas immediately surrounding the home are in fact extensions of the home. Accordingly, the officers' entry into this area to investigate their suspicions of criminal activity was an incursion into Defendant's curtilage and as a result, required a prior warrant.

Furthermore, the officers' entry onto the property is not justified by the knock-and-talk exception to the warrant requirement. It is true that "[t]he Fourth Amendment . . . is not implicated by entry upon private land to knock on a citizen's

door for legitimate police purposes unconnected with a search of the premises." United States v. Taylor, 458 F.3d 1201, 1204 (11th Cir. 2006). In other words, a "knock and talk" is not a search. See, e.g., United States v. Reed, 733 F.2d 492, 501 (8th Cir. 1994) (holding that there is no Fourth Amendment search "when police officers who enter private property restrict their movements to those areas generally made accessible to visitors-such as driveways, walkways, or similar passageways."). In those knock-and-talk scenarios, no warrant is required.

If the officers intrude upon curtilage, without a warrant, in the absence of exigent circumstances, for the "purpose of conducting a search for criminal activity," then that search is improper. United States v. Williams, 581 F.2d 451, 453 (5th Cir. 1978). Accordingly, the subjective intention of the officers upon approaching the curtilage is relevant. Taylor, 458 at 1204 (stating that if an officer has "the honest intent of asking questions of the occupant" the officer may conduct a knock and talk) (quoting Davis v. United States, 327 F.2d 301, 303 (9th Cir. 1964)). Here, Anderson testified that his reason for walking through the gate and approaching the house was his fear that the occupants may have been notified that the two trucks had been stopped and that they may have been destroying evidence. Anderson's purpose was connected to searching the premises to find the contraband and prevent its destruction. This was in spite of the fact that there was no basis to believe that evidence was being destroyed or that the occupants were even aware of the police surveillance. Therefore, this entry onto Defendant's property was connected to a search of the premises to

locate evidence of criminal activity.

While the act of knocking on a citizen's door is not normally an act of police misconduct, it can be improper when the entry is made in circumstances akin to criminal trespass, as in this case. Typically, "'officers are allowed to knock on a residence's door or otherwise approach a residence seeking to speak to the inhabitants just as any private citizen may.'" Taylor, 458 F.3d at 1204 (quoting Estate of Smith v. Marasco, 318 F.3d 497, 519 (3d Cir. 2003)). Put another way, "[u]nless expressly prohibited, an officer is permitted to approach a residence and knock on the front door of any property, to the extent that a private citizen could do the same." Lowry, 2008 U.S. App. LEXIS 26298, at *2.

In this case, a private citizen would not be expected to jump over a fence or force or deactivate a closed electronic gate to gain access to Defendant's house. A decision to erect a gate and post a "Beware of Dogs" sign manifests an intent on the part of the homeowner to exclude strangers by sealing the property around his or her home. When this intent is apparent and the expectation of privacy is clear, the police are not legally allowed to enter this area of private property without a warrant or exigent circumstances. The act of sealing off this area with a fence creates an elevated expectation of privacy. When investigating without formal process, the police are not allowed to do more than what any private citizen may legitimately do, and a private citizen may not legitimately jump over the perimeter fence or dismantle a secured gate of a private home owner, evading dogs in the process, and walk up to the doorway.

### C. Inevitable Discovery

The government argues that the theory of inevitable discovery should overcome the application of the exclusionary rule and that despite of the law enforcement officer's unconstitutional behavior, the evidence should not be suppressed.  "If the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means . . . then the deterrence rationale has so little basis that the evidence should be received." Nix v. Williams, 467 U.S. 431, 444 (1984).  Accordingly, the Eleventh Circuit has instructed the District Court "to determine whether a reasonable probability of discovery existed *prior to* the unlawful conduct, based on the information possessed and investigations being pursued at such time." United States v. Drosten, 819 F.2d 1067, 1070 (11th Cir. 1987) (emphasis added).  A very important component to this analysis is timing–whether "the lawful means which made discovery inevitable were being actively pursued prior to the occurrence" of the unlawful and unconstitutional behavior.  United States v. Virden, 488 F.3d 1317, 1322 (11th Cir. 2007).

In this case, the evidence that law enforcement had obtained up to the point of the unlawful conduct was not sufficient to establish a reasonable probability that they would have discovered the marijuana grow operation in that house.  Even Captain Anderson testified that he would have preferred more notice that Marion County planned to execute a search warrant.  He testified that he would have liked the opportunity to conduct further surveillance and investigation.

He also testified that there was no fresh marijuana found in either of the trucks that had been stopped as they were leaving the house. Law enforcement's only evidence about the house and its occupants was that a vehicle with a tracking device left the Marion County grow operation and traveled to the house at issue in this case. This Court does not dispute the Government's claim that there was significant evidence surrounding other, allegedly connected grow operations. But for this location at 6550 SE 123rd Terrace, the evidence was minimal. The connection between this house and the other grow operations was tenuous at best. Accordingly, the Government has not met its burden of demonstrating that the evidence inside of 6550 SE 123rd Terrace ultimately or inevitably would have been discovered by lawful means.

## III. Conclusion

Defendants J. Rodriguez, Y. Rodriguez and Roman have standing to challenge the search of the house. Defendant Dania Lezcano-Santana does not. In this case Defendant maintained an expectation of privacy that is recognized under the Fourth Amendment in the curtilage area immediately surrounding his home. Defendant did not extend an implicit invitation for visitors, including law enforcement, to knock on his door. To the contrary, he took steps to prevent it and maintain privacy. As a result, the process used by the officers to obtain a position close enough to the home to smell the emanating marijuana was unconstitutional.

The Court acknowledges that law enforcement officers have a duty to

investigate suspicious behavior or to ensure the safety of the general public. However, this duty does not authorize officers to overlook constitutional protections of private citizens.  In the eloquent words of Justice Joseph Bradley:

> It may be that it is the obnoxious thing in its mildest and least repulsive form; but illegitimate and unconstitutional practices get their first footing in that way, namely, by silent approaches and slight deviations from legal modes of procedure. . . . It is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon.

Boyd v. United States, 116 U.S. 616, 635 (1886).

Accordingly, it is the duty of this Court to find that the officers' slight deviation from constitutional procedure is unacceptable.  As a result, all of the marijuana that was discovered in the house, because it was obtained by the exploitation of that constitutional encroachment, must be suppressed as fruit of the poisonous tree.  See Wong Sun v. United States, 371 U.S. 471, 488 (1963). The marijuana seized from 6550 SE 123rd Terrace is therefore tainted evidence and will be suppressed.  The inevitable discovery doctrine will not cure the constitutional violation.  This behavior by law enforcement officers is precisely the type of misconduct that the exclusionary rule is meant to deter.  Accordingly, it is hereby  ORDERED AND ADJUDGED as follows:

1. The motions to suppress filed by J. Rodriguez (doc. 142), Roman (doc. 143) and, Y. Rodriguez (doc. 144), are all hereby ***granted***.

2. Defendant Roman's motion to adopt the motions to suppress filed by Defendants J. Rodriguez and Y. Rodriguez (doc. 146) is ***granted***.

3. Because she does not have standing to bring a motion to suppress,

Case 1:08-cr-00032-SPM-AK   Document 225   Filed 03/18/09   Page 20 of 20

Page 20 of 20

Defendant Dania Lezcano-Santana's motion to adopt J. Rodriguez's motion to suppress (doc. 159) is **denied**.

4. All evidence seized as a result of the search of Defendant J. Rodriguez's home on August 26, 2008, shall be inadmissible in the Government's case-in-chief.

DONE AND ORDERED this <u>eighteenth</u> day of March, 2009.

<u>  s/ Stephan P. Mickle  </u>
Stephan P. Mickle
United States District Judge